UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARIA SLATER,

        Plaintiff,

                                        Case No. 23-cv-13011

v.                                       Honorable Linda V. Parker

LOUIS DEJOY, Postmaster General
of the United States,

        Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On November 28, 2023, Plaintiff Maria Slater filed this action against the Postmaster General of the United States alleging violations of the Rehabilitation Act of 1973 in connection with her employment with the United States Postal Service ("USPS").[1]  The matter is presently before the Court on the Postmaster General's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, which is fully briefed.  (ECF Nos. 24, 26, 29.)  Finding the facts and legal arguments adequately presented in the parties' briefs, the Court is dispensing

---

[1] Mr. DeJoy is no longer the Postmaster General.  David Steiner now serves in that role.  *See* https://about.usps.com/.  Pursuant to Federal Rule of Civil Procedure 25(d), Mr. Steiner is automatically substituted for Mr. DeJoy.  The Court ordinarily would amend the docket to reflect this change; however, given its ruling on the pending motion, it finds the amendment unnecessary.

with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f).  For the following reasons, the Court concludes that the Postmaster General is entitled to summary judgment.

## I.        Summary Judgment Standard

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, "[t]he party opposing the motion must show that 'there is a genuine issue for trial' by pointing to evidence on which 'a reasonable jury could return a verdict' for that party."  *Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021) (quoting *Liberty Lobby*, 477 U.S. at 248).  The non-movant's evidence generally must be accepted as true and "all justifiable inferences" must be drawn in the non-movant's favor.  *Liberty Lobby*, 477 U.S. at 255.

## II.     Factual and Procedural Background

### A.     Ms. Slater's employment with USPS

Ms. Slater, a licensed registered nurse, began working for USPS as an occupational nurse in February 2001.  (ECF No. 24-2 at PageID.116-17.)  She worked part-time from 2001 until October 2019, at which time she converted to full-time employment.  (*Id*. at PageID.119.)  In August 2019, Shelly Smith, the Occupational Health Nurse Administrator, became Ms. Slater's supervisor.  (*Id*. at PageID.118, 124.)

Ms. Slater's job responsibilities included managing employee medical files and assessing employee medical documentation.  (ECF No. 24-2 at PageID.120, 121.)  If a USPS employee's supervisor had questions regarding the authenticity or sufficiency of medical documentation submitted by the employee, Ms. Slater had the authority to contact the employee's medical provider for verification or further information.  (*Id*. at PageID.122.)

In 2016, Ms. Slater was injured at work and suffered acute lumbar radiculopathy, which she describes as a "right shoulder and back" disability.  (*Id*. at PageID.126.)  Ms. Slater could perform her job within the medical restrictions provided by her doctor (no lifting greater than 10 pounds, no pushing or pulling, no bending or twisting, and no reaching over her right arm or shoulder).  (*Id*. at PageID.125.)  USPS' District Reasonable Accommodation Committee

accommodated Ms. Slater's restrictions, and she requested no other accommodations for this disability. (*Id.*)

In 2016, Ms. Slater submitted a claim for worker's compensation for her work-related injuries. (ECF No. 24-2 at PageID.126.) After becoming Ms. Slater's supervisor, Ms. Smith learned of Ms. Slater's worker's compensation claim and her medical restrictions. (ECF No. 24-4 at PageID.160.)

Shortly after becoming Ms. Slater's supervisor, Ms. Smith had concerns about the accuracy of medical documentation previously submitted by Ms. Slater. (ECF No. 24-4 at PageID.160.) Ms. Smith tried to verify the documentation with Ms. Slater's doctor's office, but the office did not keep copies. (*Id.*) Ms. Smith and Ms. Smith's supervisor, Kenneth Bunch, sent emails to the USPS Office of Inspector General concerning the documentation. (*Id.*; ECF No. 24-3 at PageID.155; ECF No. 24-5.)

In October 2019, Ms. Slater contacted an EEO counselor, alleging that Ms. Smith discriminated against her based on her disability by calling the doctor's office to confirm her documentation. (ECF No. 24-6.) That December, Ms. Smith learned of Ms. Slater's contact with the EEO counselor. (ECF No. 24-7; ECF No. 24-4 at PageID.161.)

In the same month, Ms. Smith placed Ms. Slater on a "Deems Desirable" list, otherwise known as a restricted sick leave, due to Ms. Slater's regular

4

unscheduled absences.  (ECF No. 24-2 at PageID.129; ECF No. 24-3 at PageID.153.)  Under USPS policy, this meant that Ms. Slater was required to submit medical documentation or other evidence to substantiate a sick leave request.  (ECF No. 24-3 at PageID.153.)  Ms. Slater claims that in December 2019, Ms. Smith also left Ms. Slater's Family Medical Leave Act paperwork in a location where other employees could see it.  (ECF No. 24-2 at PageID.130.)  On January 9, 2020, Ms. Smith issued a letter of warning to Ms. Slater for failing to discharge her duties.  (ECF No. 24-4 at PageID.163; ECF No. 24-8.)

### B.      Ms. Slater's extended leave and events during her leave

Ms. Slater did not report for work on March 19, 2020, and she remained off work through August 2020.  (ECF No. 24-2 at PageID.131, 140.)  Ms. Slater stopped reporting for work in March because she learned that a co-worker had been exposed to COVID-19, although Ms. Slater did not know whether the co-worker had tested positive for COVID-19.  (*Id.*)  Ms. Slater claims she contracted COVID-19 later in March, and she remained off work due to COVID symptoms. (*Id*. at PageID.132, 140.)  She shared this information with Ms. Smith in a phone conversation.  (*Id*. at PageID.133.)

Ms. Smith sent two letters to Ms. Slater, in April and July 2020, indicating that Ms. Slater was absent without leave and needed to submit appropriate medical documentation to cover her absence.  (ECF No. 24-9; ECF No. 24-10.)  Ms. Slater

5

mailed Ms. Smith a doctor's note after an appointment in April 2020, indicating that she was off work "under quarantine." (ECF No. 24-2 at PageID.133.) In July or August 2020, Ms. Slater sent in documentation regarding her antibody testing. (*Id.*)

Meanwhile, in June 2020, Ms. Smith went looking for missing employee documents in Ms. Slater's office and found employee medical documents in an accordion-style folder that were not properly filed. (ECF No. 24-4 at 165.) Ms. Smith then received permission to remove a lock from a large filing cabinet in Ms. Slater's office, to which she was unable to find a key, to look for the missing documents. (*Id.*) In the cabinet, Ms. Slater found confidential documents of USPS employees from another State and a different department—documents Ms. Smith contends Ms. Slater had no business reason to access. (*Id.* at PageID.166-70; ECF No. 24-11; ECF No. 24-12.) The cabinet also contained medical records that should have been stored in employee medical files, although Ms. Slater indicated that documents sometimes did not get filed for months and months because of the volume received. (ECF No. 24-11; ECF No. 24-12; ECF No. 24-2 at PageID.121)

Some of the documents in the file cabinet appeared to have been copied out of other employees' medical files. (ECF No. 24-4 at PageID.171.) Ms. Smith was concerned that Ms. Slater was using documents related to other employees' on-the-job injuries, workers' compensation claims, and EEOC cases for her own personal

use.  (*Id*. at PageID.173.)  Ms. Smith obtained statements from two employees whose documents were found in the filing cabinet, who indicated that they never gave Ms. Slater permission to access their information.  (*Id.* at PageID.170; ECF No. 24-11; ECF No. 24-12.)  Ms. Slater claims there were documents already in three or four of the filing cabinet's drawers, just thrown inside, when the cabinet was placed in her office.  (ECF No. 24-2 at PageID.134.)

On July 21, 2020, Ms. Smith sent Ms. Slater notice of an August 6 virtual investigative interview regarding Ms. Slater's Absent Without Official Leave ("AWOL") status since early April 2020.  (ECF No. 26-7.)  Ms. Slater attended via Zoom, along with her union representatives, and Labor Relations specialist Jeremy Hippensteel.  (ECF No. 24-2 at PageID.135-36.)  Ms. Smith began by discussing Ms. Slater's absence and failure to return to work but then switched the focus to the documents found in the locked file cabinet in Ms. Slater's office.  (*Id*. at PageID.136.)  After some back and forth between Ms. Smith and the union president, Ms. Slater indicated that she was very lethargic and tired and was having trouble breathing and asked if they could reschedule the meeting.  (*Id.*)

Between August 12 and 13, 2020, Ms. Smith and Mr. Hippensteel exchanged emails concerning Ms. Slater's removal.  (ECF No. 26-8; ECF No. 26-9.)

On September 8, 2020, Ms. Slater attempted to return to work.  (ECF No. 24-2 at PageID.137.)  Three days earlier, Ms. Slater called Ms. Smith and left her a

message to let her know she was returning, but Ms. Smith did not call back.  (*Id.*)

When Ms. Slater arrived on September 8, Ms. Smith met her in a vestibule area

and asked for her medical documentation to support her leave.  (*Id.*)  Ms. Slater

refused to provide it to her, as they were in a public area with ten to twenty new

hires nearby.  (*Id.*)  Ms. Slater asked to go somewhere more private, but Ms. Smith

said no and did not permit Ms. Slater to return to work.  (*Id.*)

On September 10, Ms. Slater sent USPS medical documents reflecting that

she had been evaluated by a psychiatrist on three different occasions.  (ECF No.

26-11.)  On September 11, Ms. Smith requested "Immediate Emergency

Placement" for Ms. Slater, noting the documentation and indicating that she and

Mr. Hippensteel had been working on Ms. Slater's case, but no investigative

interview had been completed.  (*Id.*)  Ms. Smith further indicated that she found

the documentation found in Ms. Slater's locked file cabinet very significant "when

you're trying to figure out how to sue the Post Office."  (*Id.*)  Ms. Slater further

expressed her concern that Ms. Smith "poses a safety risk to the USPS and the

medical unit."  (*Id.*)

In the meantime, the investigative interview had been rescheduled for

September 10, but Ms. Slater was unable to secure a union steward's attendance.

(ECF No. 24-2 at PageID.137.)  On September 14, Ms. Smith sent an email to the

USPS Office of Inspector General, outlining a "Plan of Action" with regard to Ms.

Slater, which included placing her on administrative leave, scheduling the investigative interview, completing the "investigation as soon as possible," and "mov[ing] towards removal." (ECF No. 26-12.)  Ms. Smith noted that Ms. Slater had "an EEO against [her] . . .." (*Id*.)

On September 14, Ms. Slater was placed on paid administrative leave pending the outcome of the investigation into the documents in her file cabinet. (ECF No. 24-17.)  The investigative interview resumed virtually on September 17. (ECF No. 24-2 at PageID.138.)  Ms. Slater, Ms. Smith, Mr. Hippensteel, Ms. Slater's union representative, and Labor Relations specialist Kim Green attended the interview. (*Id.*)

During the interview, Ms. Slater stated that the filing cabinet had documents inside it when it was originally moved to her office. (*Id*. at PageID.139.)  Ms. Slater admitted she did not have written permission from the employees to keep their documents in the cabinet, but she claimed she did not need permission because the medical folders are within the medical unit. (*Id*.)  When asked about several specific documents, Ms. Slater could not explain why they were in the cabinet, but she opined that they were there when she received the cabinet. (*See* ECF No. 24-18.)  Although not reflected in Mr. Hippensteel's notes from the investigative interview, Ms. Slater claims that Ms. Smith also questioned her about her treatment with a psychiatrist. (ECF No. 24-4 at PageID.138.)

On November 27, 2020, a USPS EEO investigator notified Ms. Smith of his assignment to investigate a complaint filed by Ms. Slater.  (ECF No. 26-13.)  The investigator requested certain information from Ms. Smith.  (*Id*.)  A few days later, Ms. Smith signed Ms. Slater's Notice of Removal, effective December 23, 2020, which she forwarded to USPS' labor relations to send out that day.  (ECF No. 26-14.)  The notice was subsequently revised by labor relations, with an effective removal date of January 1, 2021; however, this notice was never issued.  (ECF No. 26-15.)

Instead, USPS finally removed Ms. Slater, effective February 5, 2021, in a Notice of Removal dated January 5, 2021.  (ECF No. 24-19.)  The notice stated the reason for the removal as "inappropriate conduct" and referred to the documentation found in her office.  (*Id*.)  Ms. Smith signed the Notice of Removal, as did Human Resources Manager Crystal Curtis, who concurred in the decision. (*Id*.; ECF No. 24-12 at PageID.193.)

### C.   Ms. Slater's post-removal grievance, EEO complaints, and litigation

Ms. Slater's union filed a grievance challenging her removal, which was denied.  (ECF No. 24-2 at PageID.142; ECF No. 24-20.)  In May 2021, the union agreed to settle the grievance in exchange for a 14-day period allowing Ms. Slater to instead resign from USPS.  (ECF No. 24-2 at PageID.143-44; Ex. 24-21.)  Ms. Slater did not resign by the deadline.  (ECF No. 24-2 at PageID.144.)

In October 2020, she did file two form EEO complaints claiming discrimination based on race, sex, sexual orientation, age, disability, and retaliation.  (ECF No. 24-22.)  Ms. Slater identified several instances of perceived discrimination, including Ms. Smith's placing her on the "deems desirable" list, leaving her medical documentation in a public space, calling her doctor to confirm her medical documentation, issuing a letter of warning, conducting investigative interviews, and not allowing her to return to work in September 2020.  (*Id*.)  USPS issued a consolidated Final Agency Decision finding no discrimination on March 17, 2021.  (ECF No. 24-23.)  Ms. Slater filed an untimely appeal with the EEOC's Office of Federal Operations ("OFO")—a delay the OFO found to be without justification, and so it affirmed the agency's decision on that basis in August 2022.  (ECF No. 24-24.)  Ms. Slater's subsequent request for consideration was denied in March 2023.  (ECF No. 24-25.)

Ms. Slater filed another EEO complaint in April 2021, alleging that her removal was motivated by disability discrimination and retaliation.  (ECF No. 24-26.)  USPS issued a Final Agency Decision finding no discrimination on September 9, 2021.  (ECF No. 24-27.)  The OFO affirmed in August 2023.  (ECF No. 24-28.)

In the meantime, on June 4, 2021, Ms. Slater filed a lawsuit in federal district court against USPS and APWU, the union that represented her during her

USPS employment. (ECF No. 24-29.) Ms. Slater alleged that USPS breached its collective bargaining agreement with APWU when it removed her on January 5, 2021. (*Id.*) She also alleged that APWU breached its duty to fairly represent her. (*Id.*) Ms. Slater filed an amended complaint on August 2, 2021, adding a claim for breach of the APWU constitution. (ECF No. 24-30.)

APWU and USPS moved to dismiss Ms. Slater's claims. *See Slater v. APWU*, No. 21-cv-11326 (E.D. Mich.), ECF Nos. 9, 12. While the motions were pending, APWU moved to stay the litigation until the National Labor Relations Board ("NLRB") resolved a charge Ms. Slater filed against the union. *See id.*, ECF No. 16. The Honorable Bernard A. Friedman, to whom the case was assigned, granted the motion to stay on October 5, 2021, staying the matter "pending the resolution of the proceedings before the NLRB." *See id.*, ECF No. 20.

A few weeks later, on October 28, APWU filed a "Notice of Dismissal of Plaintiff's NLRB Charge," along with an October 5, 2001 letter to Ms. Slater notifying her of the dismissal. *See id.*, ECF No. 21. APWU advised that the NLRB dismissed Plaintiff's charge, finding insufficient evidence to establish a violation of the National Labor Relations Act, and that the time for Ms. Slater to appeal had expired. *Id.* On December 3, 2021, Judge Friedman denied the defendants' previously filed motions to dismiss without prejudice, concluding that

12

"the most prudent course" is for the motions to be renewed "once the NLRB proceeding is concluded and the stay . . . is lifted."[2]  *See id.*, ECF No. 22.

APWU and USPS filed renewed motions to dismiss on December 10 and 17, 2021, respectively.  *See id.*, ECF Nos. 23, 24.  Judge Friedman granted the motions and entered a judgment on February 14, 2022.  (ECF No. 24-30.)  The Sixth Circuit affirmed on November 9, 2022.  (ECF No. 24-32.)

Ms. Slater filed the current lawsuit against the Postmaster General about a year later, on November 28, 2023.  (ECF No. 1.)  In her Complaint, Ms. Slater asserts a single count titled "Violations of the Rehabilitation Act of 1973."  (*Id.* at PageID.8.)  Within the Complaint, Ms. Slater alleges that she was terminated because of her disability, that USPS failed to accommodate her disability, and that she was terminated in retaliation for engaging in protected activity.  After discovery closed, the Postmaster General filed the pending summary judgment motion.  (ECF No. 24.)

---

[2] Judge Friedman's order is somewhat perplexing, as APWU had filed its notice more than a month earlier, indicating that the NLRB proceeding had concluded.  It is unclear why Judge Friedman did not lift the stay at that time.  Nevertheless, the parties proceeded as if the stay had been lifted.  As set forth *infra*, the defendants filed renewed motions to dismiss shortly thereafter.  Ms. Slater responded to the motions, never noting that the stay remained in place.

### III.     Applicable Law & Analysis

#### A.     The parties' arguments

The Postmaster General seeks summary judgment, arguing that any claims arising from Ms. Slater's 2020 EEO complaint are barred because she failed to exhaust the claims.  The Postmaster General further argues that any claims relating to Ms. Slater's removal from USPS are barred by the doctrine of claim preclusion because they could have been raised in her first lawsuit but were not.  The Postmaster General also asserts that Ms. Slater fails to establish the necessary elements of any disability discrimination, retaliation, or failure to accommodate claim.

In response to the Postmaster General's motion, Ms. Slater argues that claim preclusion does not bar the claims related to her removal.  (*See* ECF No. 26 at PageID.389.)  Ms. Slater also maintains that there are material questions of fact relevant to her retaliation and disability discrimination claims.  (*Id.*)  Ms. Slater does not contest her failure to administratively exhaust the claims in her 2020 EEO complaint, however.  (*See generally id.*)  Nor does she attempt to show support for her failure to accommodate claim.  (*See generally id.*)  Therefore, Ms. Slater forfeits the claims in her 2020 EEO complaint and any failure to accommodate claim.  *See Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) (finding arguments not raised and those adverted to in only a perfunctory manner forfeited)

14

(citation omitted); *see also Herring v. City of Ecorse*, No. 24-1916, 2025 WL 2105263, at \*5 (6th Cir. Sept. 16, 2024) (quoting *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019)) (recognizing that the Sixth Circuit has used "waiver" and "forfeiture" interchangeably sometimes, but explaining that "[w]aiver is affirmative and intentional, whereas forfeiture is a more passive failure to make the timely assertion of a right").

The Court begins by analyzing whether the doctrine of claim preclusion bars Ms. Slater's pending claims.

### B.      Claim preclusion

"Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit." *Donald v. Frugal I, Inc.*, 74 F. App'x 593, 595 (6th Cir. 2003) (quoting *Heyliger v. State Univ. & Cmty. Coll. Sys. of Tenn.*, 126 F.3d 849, 852 (6th Cir. 1997)). In other words, it "prevents a party from litigating matters that should have been raised in an earlier case but were not." *Robinson v. Postmaster Gen. of the U.S.*, No. 23-3863, 2025 WL 48235, at \*1 (6th Cir. Jan. 8, 2025) (quoting *Arangure v. Whitaker*, 911 F.3d 333, 337 (6th Cir. 2018)). The doctrine "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, prevent[s] inconsistent decisions, encourage[s] reliance on adjudication, and[,]" in some scenarios, "promote[s]

15

comity between the state and federal courts." *Dubuc v. Green Oak Twp.*, 312 F.3d 736, 744 (6th Cir. 2002) (citing *Allen v. McCurry*, 449 U.S. 90, 94, 96 (1980)).

"Federal law governs the preclusive effect of a federal court judgment." *Robinson*, 2025 WL 48235, at *1 (citing *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008)).  Under federal law, claim preclusion applies if:

> (1) an earlier case was litigated to a final judgment on the merits; (2) the earlier case involved the same parties as this suit; (3) the claims in the earlier case arose out of the same factual occurrence as the claims here; and (4) [the plaintiff] could have raised these claims in the earlier lawsuit.

*Id.* (citing *Arangure*, 911 F.3d at 345); *see also Wheeler v. Dayton Police Dep't*, 807 F.3d 766 (6th Cir. 2015) (citing *Montana v. United States*, 440 U.S. 147, 153 (1979)).  There is no dispute here that Ms. Slater brought an earlier lawsuit against USPS arising from her termination, which was litigated to a final judgment on the merits.  Although Ms. Slater does not dispute the Postmaster General's showing with respect to the first three claim-preclusion requirements, she does dispute whether she could have raised her current claims in the earlier litigation.

Relevant to that issue, Ms. Slater concedes in her response brief that she could have filed a civil action asserting the claims relating to her removal within 90 days of receipt of notice of final action taken by USPS.  (*See* ECF No. 26 at PageID.390); *see also* 42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.407.  USPS issued its final decision on September 9, 2021, which gave Ms. Slater until

16

December 8, 2021 to file a civil action asserting the claims in her EEO complaint or seek leave to file a second amended complaint in the lawsuit pending before Judge Friedman.  Ms. Slater cites no authority to support a finding that she was precluded from doing so because of the stay in Judge Friedman's case.

Notably, there was almost a month between the issuance of the final agency action and Judge Friedman's imposition of the stay.  Moreover, the stay was expressly in place only until the NLRB proceedings concluded.  Once that occurred, Ms. Slater did not request leave to file a second amended complaint.  *See Robinson*, 2025 WL 48235, at *3 (citing *Heyliger*, 126 F.3d at, 856) ("Our court has held that the fourth element of claim preclusion is satisfied when a plaintiff can seek leave to amend his first lawsuit to include claims that ripen after the filing of the first lawsuit.").  Nor did she do so after the defendants filed renewed motions to dismiss or in the almost two months the motions were pending.  Additionally, Ms. Slater's second EEO complaint was pending when she filed the first action—long before the stay was entered.  She could have moved to stay those proceedings pending the exhaustion of her second EEO complaint to bring all her claims in one civil action.  *See Donald*, 74 F. App'x at 596-97 (concluding that the plaintiffs could and should have made an effort to bring all their claims in one venue and that nothing prevented them from seeking a stay and amending their complaints once administrative proceedings were exhausted).

For these reasons, the Court finds Ms. Slater's claims in the present lawsuit barred by claim preclusion. The Court, therefore, does not address the merits of those claims.

Accordingly,

**IT IS ORDERED** that the Postmaster General's motion for summary judgment (ECF No. 24) is **GRANTED**.

Date: May 29, 2026                    s/LINDA V. PARKER
                                      U.S. DISTRICT JUDGE